**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) **99 Civ. 0962 (RCC)** |
| In Re: STOCK EXCHANGES OPTIONS TRADING | ) **MDL No. 1283** |
| ANTITRUST LITIGATION | ) |
| | ) **Master Docket No. M-21-79** |
| This Document Relates To: | ) **(RCC)** |
| | ) |
| ALL ACTIONS | ) **MEMORANDUM & ORDER** |
| | ) |

**RICHARD CONWAY CASEY, United States District Judge:**

Plaintiffs brought these consolidated putative class actions against five national stock exchanges and other defendants alleging violations of the antitrust laws regarding the listing and trading of equity options. Plaintiffs have submitted three settlement agreements for the Court's preliminary approval pursuant to Federal Rule of Civil Procedure 23(e). Some of the defendants have raised objections to such approval. For the following reasons, Plaintiffs' motion for preliminary approval of the settlement agreements is **DENIED IN PART and GRANTED IN PART**.

**I.      BACKGROUND**

**A.      History of the Class Actions**[1]

Plaintiffs, a putative class of equity-options purchasers, brought more than twenty class actions in district courts throughout the country alleging that the defendants conspired to confine the listing and trading of certain options to only one stock exchange at a time, in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Defendants in these suits originally were a group of

---

[1] For a more thorough statement of the claims and procedural history of these actions, see In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d 134, 138-44 (2d Cir. 2003); In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d 174, 175-77 (S.D.N.Y. 2001); In re Stock Exchs. Options Trading Antitrust Litig., MDL No. 1283, M-21-79 (RCC), 99 Civ. 962 (RCC), 2001 WL 128325, at *1-6 (S.D.N.Y. Feb. 15, 2001).

stock exchanges—the American Stock Exchange ("AMEX"); the Chicago Board Options Exchange, Inc. ("CBOE"); the New York Stock Exchange ("NYSE"); the Pacific Stock Exchange, Inc. ("PCX"); and the Philadelphia Stock Exchange, Inc. ("PHLX")—and a group of twenty-eight market makers and options-trading specialists ("Market-Maker Defendants"). The Judicial Panel on Multidistrict Litigation transferred all the actions to this Court for consolidated pretrial proceedings, and Plaintiffs filed a consolidated complaint.

In January 2000, Defendants moved to dismiss the consolidated complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Congress had impliedly repealed the antitrust laws with respect to the listing and trading of options by giving the Securities and Exchange Commission the power to regulate the area in the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. The Court converted the motions to motions for summary judgment and so notified the parties, providing time for additional briefing. While the motions were pending, Plaintiffs entered into three separate settlement agreements with PCX, PHLX, and a group of defendants including AMEX, CBOE, and eighteen of the Market-Maker Defendants, which were submitted for the Court's approval pursuant to Federal Rule of Civil Procedure 23(e). The Court deferred ruling on the motions for preliminary approval of the three settlement agreements until after it had ruled on the converted motions for summary judgment. On February 14, 2001, the Court granted the motions for summary judgment on the ground of implied repeal of the antitrust laws. See In re Stock Exchs. Options Trading Antitrust Litig., MDL No. 1283, M-21-79 (RCC), 99 Civ. 962 (RCC), 2001 WL 128325 (S.D.N.Y. Feb. 15, 2001). The Court then entered a final judgment dismissing the consolidated complaint.

In March 2001, Plaintiffs moved pursuant to Federal Rule of Civil Procedure 59(e), to amend

the judgment so that it would not apply to those defendants that had entered into settlement agreements prior to the Court granting summary judgment, and moved for preliminary approval of the settlements. In a decision dated April 24, 2001, the Court denied the motion to amend the judgment and denied preliminary approval of the settlements, concluding that it lacked subject matter jurisdiction to approve the settlement agreements because, when the Court granted summary judgment in the defendants' favor, "there was no longer any cause of action over which the Court could exercise jurisdiction." In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d 174, 178 (S.D.N.Y. 2001). The Court stated, "[P]laintiffs' motions for preliminary approval of their settlement agreements and to alter or amend the Court's judgment . . . are hereby denied." Id. at 179.

Plaintiffs appealed the Court's summary-judgment decision and its decision that it lacked subject matter jurisdiction to approve the settlement agreements. The Second Circuit affirmed dismissal of the complaint, agreeing that the Sherman Act had been impliedly repealed with regard to the listing and trading of equity options. See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d 134, 148 (2d Cir. 2003). However, the Second Circuit reversed this Court's determination that it lacked subject matter jurisdiction to approve the settlements, holding:

> Since the parties sought approval of their settlement agreements before the court had adjudicated the immunity defense [conveyed by implied repeal of the antitrust laws], and since such a defense may be waived, the court had jurisdiction to entertain and rule on the motions for approval of the proposed settlements. Having entered a final judgment without dealing with those pending motions, the court should have entertained them in conjunction with the subsequent motion to alter or amend the final judgment, and it should have granted the latter motion if it approved the proposed settlements.

Id. at 153. The Second Circuit also noted that LETCO, one of the Market-Maker Defendants, had raised the argument that the settlement agreement to which it was a party became void by its own

terms upon this Court's denial of the motion to preliminarily approve it in April 2001. Id. The court stated, "We express no view as to the correctness of LETCO's contention . . . . That question may be considered by the district court on remand." Id.

Plaintiffs once against seek preliminary approval of the settlement agreement with PCX ("PCX Settlement"); the agreement with PHLX ("PHLX Settlement"); and the agreement with AMEX, CBOE, and the Market-Maker Defendants, which Plaintiffs refer to as the "Global Settlement." Along with the agreements, Plaintiffs seek preliminary approval of a Proposed Plan of Distribution ("Distribution Plan") for the settlement payments ("Settlement Fund"), a Notice of Pendency of the class action ("Notice"), a Proof of Claim and Release form ("Proof of Claim"), a Summary Notice of the class action ("Summary Notice"), and an Order Preliminarily Approving the Proposed Settlement ("Preliminary-Approval Order"). Multiple defendants and one third-party intervenor have raised various objections to approval of the agreements and the other documents.

### B.      Objections to the Global Settlement

Some defendants and a third-party intervenor raise objections to approval of the Global Settlement. Market-Maker Defendants LETCO, Omega Options LLC ("Omega"), Cranmer & Cranmer, Inc. ("Cranmer"), Kalb Voorhis & Co. ("Kalb"), and AGS Specialist Partners ("AGS"), and third-party Susquehanna International Group, LLP ("Susquehanna") (collectively, "Objecting Market Makers") raise the argument that LETCO made on appeal.[2] They maintain that the Global Settlement was rendered void upon entry of this Court's April 2001 decision denying the motions for preliminary approval under a provision of the Global Settlement that states, "In the event . . . the

_____

[2] These defendants raise other objections as well, but it is unnecessary for the Court to reach them as explained herein.

Court denies the motion for preliminary or final approval of this Settlement Agreement or any material part of it . . . the settlement provided for by this Settlement Agreement shall be rescinded and be null and void . . . ." (Global Settlement ¶ 22, Ex. C to Compendium of Settlement Documents Supp. Pls.' Mot. Preliminary Approval of the Proposed Class Action Settlement ("Settlement Compendium").) The Objecting Market Makers therefore oppose preliminary approval of the Global Settlement and cross-move for an order that the payments they already made should be returned to them with interest under paragraph 23 of the Global Agreement: "In the event the settlement is terminated, rescinded, or is null and void for any reason, within five (5) business days of such an event the Settlement Fund . . . , including interest, shall be dispersed to such Settling Parties in proportion to their contributions . . . ." (<u>Id.</u> ¶ 23.)

CBOE maintains that the Global Settlement cannot be approved because Plaintiffs breached the agreement when Plaintiffs' lead counsel commenced a suit in the Northern District of Illinois, <u>Last Atlantis LLC v. Chicago Bd. Options Exch., Inc.</u>, No. 04 C 0397, asserting claims that purportedly fall within the scope of a release and covenant not to sue in the Global Agreement (<u>see</u> Global Agreement ¶ 25). CBOE contends that Plaintiffs have asserted that the release and covenant not to sue would be impermissible under <u>National Super Spuds, Inc. v. New York Mercantile Exchange, Inc.</u>, 660 F.2d 9 (2d Cir. 1981), if given its plain meaning and therefore cannot be read as broadly as its terms. CBOE disagrees with Plaintiffs' purported interpretation of the release and covenant not to sue.[3] It is CBOE's position that the provision protects it from any potential claims that have any connection to the allegations in Plaintiffs' consolidated complaint. CBOE essentially

---

[3] Market Maker Defendant Arbitrade Holdings, LLC, joins in CBOE's arguments as does PHLX.

asks the Court for a ruling on the scope of the release and covenant, and, if its meaning brings it into conflict with the Second Circuit's decision in <u>Super Spuds</u>, then requests that the Court deny preliminary approval of the settlement agreement. CBOE also argues that when Plaintiffs' lead counsel filed the <u>Lost Atlantis</u> suit in the Northern District of Illinois, Plaintiffs breached their covenant of good faith and fair dealing that is implied in the Global Settlement and a contractual provision that requires Plaintiffs to use their best efforts to effectuate the settlement.

In addition, CBOE objects to (1) a provision of the Notice that would require it to post copies of the Summary Notice on its website with a link to a website created and maintained by Plaintiffs; (2) a provision of the Preliminary-Approval Order also requiring it to post a link on its website to Plaintiffs' website and a statement announcing the settlement; and (3) a provision of the Distribution Plan providing for a "Supplemental Notice Program" if a significant number of class members do not submit claim forms, and a method of distribution of excess funds after such supplemental notice. Finally, CBOE does not join the Objecting Market Makers' argument that the Global Settlement is void, but, like AMEX, contends that if the Court accepts this argument, the agreement should be rendered void as to CBOE as well.

AMEX does not oppose preliminary approval of the Global Settlement, but states that should the Court determine the scope of the release and covenant not to sue is less extensive than the plain language provides, then AMEX would object to approval. AMEX also submits that if the Court sustains the objection of the Objecting Market Makers that the Global Agreement was rescinded upon this Court's denial of preliminary approval in April 2001, then that ruling should render the agreement void as to all settling defendants and not just the Objecting Market Makers.

### C. Objections to the PCX Settlement

PCX argues that it has already paid all of the settlement funds that the PCX Settlement requires, and seeks an order from the Court to that effect. The PCX Settlement contains a provision that Plaintiffs and PCX agree entitles PCX to a 50% reduction in the amount that PCX must pay because the Court granted the motions for summary judgment. PCX has already made one payment under the agreement, of which Plaintiffs returned a portion. PCX argues that Plaintiffs should be ordered to recalculate the amount to be returned, as the amount returned was not a full 50% of the payment made. PCX also argues that the agreement does not require it to pay anything further. PCX also objects to the Notice and Preliminary-Approval Order provisions that would require it to post a copy of the Summary Notice and a link on its website to Plaintiffs' website, and to the provision of the Distribution Plan addressing excess funds in the Settlement Fund and the Supplemental Notice Program.

### D. Objections to the PHLX Settlement

PHLX raises a number of objections to preliminary approval of its agreement with Plaintiffs. First, it joins in CBOE's request that the Court define the scope of the release and covenant not to sue in the Global Agreement, which is substantially the same as to the release and covenant in the PHLX Settlement. Second, PHLX seeks an equitable recoupment or set off regarding the payment it made under the PHLX Settlement based on Plaintiffs' failure to secure releases from the other settling defendants for any claims the other settling defendants might have against PHLX relating to the subject matter of these actions. Third, PHLX objects to the Notice and Preliminary-Approval Order because they do not require opting-out class members to provide sufficient information about themselves and their claims; PHLX seeks the addition of language requiring information and

language in the Preliminary-Approval Order that requires Plaintiffs to comply with their obligations to the settling defendants to provide information about the opting-out class members. Fourth, PHLX maintains that it should get the benefit of any ruling that PCX need not make any additional payment under the PCX Settlement. Fifth, it requests additional language in the Proof of Claim and Release and the Notice to explain the scope of the release contained in the PHLX Settlement. Finally, PHLX claims that, if the Global Settlement is null and void, so too is the PHLX Settlement because the latter contains an identical clause to paragraph 22 of the Global Settlement.

## II.    DISCUSSION

### A.    Standard for Preliminary Approval of a Class-Action Settlement

No certified class action may be settled without court approval. Fed. R. Civ. P. 23(e)(1)(A) ("The court must approve any settlement . . . of a certified class action."). Preliminary approval is generally the first step in a two-step process before a class-action settlement is approved. In re NASDAQ Market-Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citing Manual for Complex Litigation, Third, § 30.41). As the court in NASDAQ Market-Makers explained:

> In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice. Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.

Id. In the context of settlement, courts often provisionally certify the class along with preliminary approval of the settlement. See Denney v. Jenkins & Gilchrist, No. 03 Civ. 5460 (SAS), 2005 WL 388562, at *24 (S.D.N.Y. Feb. 18, 2005) ("Courts have frequently certified settlement classes on a preliminary basis, at the same time as the preliminary approval of the fairness of the settlement, and

solely for the purpose of settlement, deferring final certification of the class until after the fairness hearing."). The second step is to give notice to class members and to hold a hearing to determine whether final approval of the settlement should be given. NASDAQ Market-Makers, 176 F.R.D. at 102.

There is little question that the settlement agreements here are fair and adequate to the class because they would provide what further litigation could not—any recovery for class members. While the settlement agreements in total provide for a Settlement Fund of more than $80 million, Plaintiffs have no viable cause of action that any further litigation could vindicate. See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 148. The objections to the settlement agreements concern potential deficiencies that have little to do with the reasonableness of the settlement, but regard the scope and proper interpretation of the agreements.

**B.    Impediments to Preliminary Approval of the Settlement Agreements**

**1.    The Global Settlement Was Rendered Null and Void**

The Objecting Market Makers argue that this Court's order of April 24, 2001 rendered the Global Settlement null and void under paragraph 22 of that settlement agreement, and therefore there is no settlement for the Court to approve.[4] Paragraph 22 states:

> In the event (i) the Court denies the motion for preliminary or final approval of this Settlement Agreement or any material part of it, (ii) the Court denies the motion for entry of a final judgment of the Court . . . , (iii) the final judgment . . . shall have been vacated, reversed or modified upon appeal, or (iv) the Settlement Agreement is rescinded, withdrawn, or otherwise terminated in accordance with its terms, the

---

[4]As Plaintiffs acknowledge, the Second Circuit's opinion expressly permits the Objecting Market Makers to raise this issue on remand. See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 153 ("We express no view as to the correctness of LETCO's contention that the [Global] settlement agreement became void . . . . That question may be considered by the district court on remand.").

settlement provided for by this Settlement Agreement shall be rescinded and be null and void, unless some or all Settling Parties shall proceed with the Settlement Agreement as modified.

(Global Settlement ¶ 22.)  In the April 2001 decision, the Court held that it could not preliminarily approve the settlement agreements because it lacked subject matter jurisdiction, having granted summary judgment to the defendants.  See In re Stock Exchs. Options Trading Antitrust Litig., 171 F. Supp. 2d at 178.  Accordingly, the Court stated, "[P]laintiffs' motions for preliminary approval of their settlement agreements . . . are hereby denied."  Id. at 179.

Plaintiffs argue that the Objecting Market Makers incorrectly interpret paragraph 22; that the Court did not actually deny the motion for preliminary approval because it held that it had no subject matter jurisdiction to consider the motion; and that because the Court's April 2001 decision was vacated it can give rise to no legal rights or obligations.

On Plaintiffs' first contention, the determinative question is whether paragraph 22 of the Global Settlement only applies to a denial of preliminary approval that is upheld on appeal.  The matter is one of contractual interpretation, on which this Court must follow state law.[5]  See Volt Info. Sciences, Inc. v. Bd. of Trus., 489 U.S. 468, 474 (1989).  Although the parties did not brief which state law applies, most rely on New York law and none suggest that a different state's law applies, which is sufficient to render New York law, as the forum state's law, applicable.  See Tehran-

---

[5] "Neither the Federal Rules of Civil Procedure nor any statute give federal courts the inherent power to interpret . . . settlement agreements, even those that pertain to litigation originally pending in federal courts, absent some independent basis of jurisdiction."  Nat'l Presto Indus., Inc. v. Dazey Corp., 107 F.3d 1576, 1580 (7th Cir. 1997) (citing Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 378 (1994)).  The Second Circuit has informed this Court that it has subject matter jurisdiction to approve the settlement agreements despite the dismissal of the underlying action.  See In re Stock Exchs. Options Trading Antitrust Litig., 317 F.3d at 153.  Accordingly, if the Court has jurisdiction to approve the settlements, it must have jurisdiction to interpret them as necessary in aid of the approval process.

Berkely Civil & Envtl. Eng'rs, 888 F.2d 239, 242 (2d Cir. 1989) (applying New York law when, although the parties did not brief the issue, they relied on New York law in their briefs because "implied consent to use a forum's law is sufficient choice of law"). Accordingly, the Court turns to New York contract principles.

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000). The task of the Court interpreting a contract is to give effect to the parties' intent. Civil Serv. Employees Ass'n, Inc. v. Plainedge Union Free Sch. Dist., 786 N.Y.S.2d 59, 60 (App. Div. 2004). The Court must read the contract as a whole to determine that intent. Aimco Chelsea Land, LLC v. Bassey, 773 N.Y.S.2d 908, 909 (App. Div. 2004). When a contract is unambiguous on its face, "the intent of the parties must be gleaned from the four corners of the instrument, and not from extrinsic evidence." Rainbow v. Swisher, 527 N.E.2d 258, 259 (N.Y. 1988).

Plaintiffs argue that the parties did not contemplate a dismissal for lack of subject matter jurisdiction when they agreed to rescind the Global Settlement upon "deni[al] [of] the motion for preliminary or final approval." As Plaintiffs put it, "[e]ven if Paragraph 22 were found to be ambiguous, the provision may not be construed to terminate the Settlement as a result of a wholly unanticipated decision by the Court, issued sua sponte, that it lacked subject matter jurisdiction to hear the motion." (Pls.' Reply at 10-11.) But paragraph 22 contains no ambiguity. "[A] contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138-39 (2d Cir. 2000) (applying New York law). There is

11

a difference, however, between contractual language that is ambiguous and a contractual provision that simply omits certain language. See Reiss v. Fin. Performance Co., 764 N.E.2d 958, 961 (N.Y. 2001).

In Reiss, the defendant corporation had issued warrants to the plaintiffs for the purchase of a certain number of shares at the price of 10 cents per share. Id. at 959. The defendant's shareholders approved a one-for-five reverse stock split, which meant that each shareholder owned only one-fifth of his or her original number of shares but at a value of five times more per share. Id. at 960. The warrants, which were contractually binding, did not provide for the circumstances of a stock split. Id. at 959-60. The plaintiffs sought to exercise the warrants to purchase stock at 10 cents per share but without adjustment in the number of shares that could be purchased to reflect the reverse stock split, a request that the defendant rejected. Id. at 960. The Appellate Division held that the warrants did not provide for the contingency of a stock split, were therefore missing an essential term, and looked to the parties' intent to imply a term that required adjustment in the provisions of the warrant to account for the reverse stock split. Id. The Court of Appeals reversed, holding that the warrants were contracts that were complete in that they contained all the essential elements of a contract and could be enforced according to their terms. Id.

The Court of Appeals explained that the warrants were not ambiguous merely because they were silent as to the contingency of a reverse stock split. See id. ("An omission or mistake in a contract does not constitute an ambiguity. . . ." (internal quotation marks omitted)). Furthermore, the court stated, "where a contingency has been omitted, we will not necessarily imply a term since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Id. The court

12

therefore held that in New York, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." Id. at 960 (internal quotation marks omitted).

The terms of paragraph 22 render the Global Settlement null and void upon denial of the motion for preliminary approval; the paragraph omits any reference to the fate of such a denial on appeal. To imply a clause such as "unless vacated on appeal" or "except for lack of subject matter jurisdiction" would be to make a new contract under the guise of contractual interpretation rather than to enforce the writing according to its terms.[6] As in Reiss, the Global Settlement is complete and clear and can be enforced according to its terms. Therefore, the Court must do so rather than reading in a clause that is absent.

That this is the correct interpretation is confirmed by reading paragraph 22 in context with other provisions of the Global Settlement. The parties expressly contemplated that this Court might grant the pending motions to dismiss (which the Court converted to motions for summary judgment). The parties agreed that the Court's ruling on those motions would have no effect, in contrast to denial of preliminary approval of the Global Settlement: "The parties' obligations in this Settlement Agreement shall not be altered or affected by the outcome of any motions pending or hereafter made in the Class Action except any motion with respect to the preliminary or final approval of the settlement contemplated herein . . . ." (Global Settlement ¶ 13(d).) The parties did not condition their obligations on anything but this Court's decisions; no mention of appeals was made with regard

---

[6] Whether the settlement is ambiguous is for the Court to determine as a matter of law. Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002). Because the Global Settlement is not ambiguous, the Court may not refer to the extrinsic evidence that Plaintiffs proffer in support of their construction of paragraph 22. See id. ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.").

to either the motions to dismiss or the preliminary-approval motion.

In contrast, other provisions of the Global Settlement do tie obligations to results on appeal. The parties agreed in paragraph 21 that the Global Settlement would become final on the date upon which:

> [T]he time for any appeal from the final judgment of dismissal and the Court's approval of this Settlement Agreement pursuant to Fed. R. Civ. P. 23 shall have expired, or, if appealed, the final judgment has been affirmed in its entirety by the Court of last resort to which any such appeal has been taken and such affirmance has become no longer subject to further appeal or review.

(Id. ¶ 21.)  Although the parties conditioned the agreement's effective date on the conclusion of appeals, they omitted such a condition with regard to the agreement's rescission.  The Court must conclude that they did so purposefully in both cases.

A different clause in paragraph 22 addresses reversal on appeal.  It provides for rescission of the Global Agreement if "the final judgment . . . shall have been vacated, reversed or modified upon appeal."  (Global Settlement ¶ 22.)  Thus, in the very same paragraph as the one at issue here, the parties expressly included a provision providing for rescission in the event that the Second Circuit reversed this Court's entry of final judgment.  The fact that they omitted such a provision earlier in the paragraph again suggests that the omission was intentional and that the parties did not intend the clause providing for rescission upon denial of preliminary approval to include the limitation, "unless reversed on appeal."  It is therefore apparent that the parties did not fail to anticipate appellate proceedings regarding approval of the settlement.

Plaintiffs argue that the Court did not deny the motions for preliminary approval because it held that it lacked subject matter jurisdiction to approve them.  However, the Court expressly stated, "[P]laintiffs' motions for preliminary approval of their settlement agreements . . . are hereby denied."

171 F. Supp. 2d at 179 (emphasis added). Paragraph 22 conditions rescission on the fact of the Court's denial of the motion for preliminary approval, not on the propriety of such a denial. The relevant question is whether the Court denied the motion, not whether it was correct to do so. On the former question, the Court could not have been any clearer.

Plaintiffs also rely on the proposition that a lower-court order vacated on appeal has no legal effect. But parties can contract beyond the rights to which statutory or common law would entitle them, provided it is not against public policy or illegal. See 64th Assocs., L.L.C. v. Manhattan Eye, Ear & Throat Hosp., 813 N.E.2d 887, 889 (N.Y. 2004). The parties were free to contract for rights to rescind the Global Settlement beyond what rights this Court's now-vacated order might have provided. The cases that Plaintiffs cite do not command a different result. They merely stand for the unremarkable proposition that orders vacated by the court that entered them or by a higher court cannot themselves give rise to any rights or responsibilities. See United States v. Jerry, 487 F.2d 600, 607 (3d Cir. 1973) (holding that vacataur of an order granting a motion to withdraw a guilty plea resulted in reinstatement of the defendant to the position he occupied before the motion was granted); Wynne v. Rochelle, 385 F.2d 789, 796 (5th Cir. 1967) (holding that court's vacataur of its own order meant that "the prior status of the case [was] restored"); In re Rochester Sanitarium & Baths Co., 222 F. 22, 26 (2d Cir. 1915) (holding that court's order vacating its prior order discharging bankruptcy trustee reinstated trustee). The rights and responsibilities here arise by way of contract and not from the Court's order itself.

Because the clear and unequivocal terms of the Global Settlement provide that it was rendered null and void when the Court denied preliminary approval in April 2001, there is no agreement for the Court to approve now. However, paragraph 22 of the Global Settlement contains

an exception; it provides that, despite rescission upon denial of the motion for preliminary approval, "some or all Settling Parties and Plaintiffs [may] agree to proceed with the settlement as and if modified by the Court, in which event the Plaintiffs and such Settling Parties shall proceed with the Settlement Agreement as modified." (Global Settlement ¶ 22.) There is a dispute about whether some parties to the agreement did so agree after the Court's April 2001 decision. Plaintiffs acknowledge that the Objecting Market Makers did not agree to proceed. (Pls.' Mem. at 30.) On the record before the Court, however, it is not possible to conclusively determine whether AMEX, CBOE, and the other Market-Maker Defendants agreed to proceed in accordance with this clause of the settlement.

AMEX contends that if the Court adopts the Objecting Market Makers' argument, then the Global Settlement should be disapproved in its entirety. The terms of paragraph 22, however, contemplate a different result. The agreement states that it is null and void "unless some or all Settling Parties shall proceed with the Settlement Agreement as modified." (Global Settlement ¶ 22 (emphasis added).) It thus provides for a settlement among some but not all of the parties to it. CBOE admits that both it and AMEX confirmed in a letter to Plaintiffs that the Global Settlement remained in effect pending Plaintiffs' appeal. (CBOE Objs. at 13.) But that letter was sent before the Court's April 2001 decision, and, according to CBOE, did not modify, amend, or renew the Global Settlement. CBOE therefore contends that it did not agree to proceed under paragraph 22. In light of the Court's determination that paragraph 22 did provide for rescission of the Global Settlement, and the uncertainty as to whether CBOE, AMEX, and the Market-Maker Defendants other than the Objecting Market Makers agreed to proceed under paragraph 22, the Court directs that supplemental briefing address the issue.

Finally, the Objecting Market Makers move for an order that Plaintiffs return payments made under the Global Settlement because that settlement is null and void. Paragraph 23 of the Global Settlement provides that "[i]n the event the settlement is terminated, rescinded, or is null and void for any reason, within (5) business days of such event the Settlement Fund (or any portion of it attributable to each Settling Party), including interest, shall be disbursed to such Settling Parties in proportion to their contributions . . . ." (Global Settlement ¶ 23.) The Objecting Market Makers made payments under the agreement before the Court denied preliminary approval of it and now seek their money back under paragraph 23. Because the Global Settlement was rendered null and void under paragraph 22, the Objecting Market Makers have a contractual right to a return of the payments made under paragraph 23. Plaintiffs are thus ordered to return the Objecting Market Makers' payments made under the Global Settlement plus interest.

2.      **PCX's Payment Obligations Are Unenforceable For Frustration of Purpose**

PCX opposes preliminary approval of the PCX Settlement because the proposed order approving it would require PCX to make additional payments into the Settlement Fund. Paragraph 6 of the PCX Settlement sets forth the payment obligations:

> PCX shall pay the sum of $4.5 million in full settlement of the Released Claims . . . . Payments will be due and payable on the following dates in the specified amounts . . . :
> (i) the first payment, in the amount of $1 million, shall be due and payable on the third business day following execution of this Settlement Agreement; (ii) the second payment, in the amount of $1 million shall be due and payable on the third business day following PCX's receipt of notice that the Court has entered an order preliminarily approving the Settlement Agreement in accordance with paragraph 12 below; (iii) the third payment, in the amount of $1 million, shall be due and payable 60 days after the due date of the second payment; and (iv) the fourth payment, in the amount of $1.5 million, shall be due and payable on the third business day after PCX receives notice of the Court's entry of judgment finally approving the Settlement

17

Agreement . . . .

(PCX Settlement ¶ 6, Ex. A to Settlement Compendium.)  Paragraph 12 provides that the Plaintiffs were to submit a motion for preliminary approval of the PCX Settlement no later than thirty days after the parties executed the agreement, which they did.  (Id. ¶ 12.)  Paragraph 16 addresses the motions to dismiss, and states:

> Should the Court, at any time prior to the complete disbursement of the entire Settlement Fund (or such portion of such Fund attributable to PCX), grant one or more of the Motions [to Dismiss] and enter judgment dismissing the claims against all of the Exchange Defendants in their entirety and with prejudice from the above-referenced Class Action, then as to any remaining portion of the Settlement Fund (or such portion of such Fund as is attributable to PCX), Counsel for Plaintiffs shall immediately cease all disbursements of the Settlement Fund other than those necessary to pay for the continuing administration of such Fund.

(Id. ¶ 16.)

That paragraph of the PCX Settlement also provides for a return of 50% of payments made by PCX should dismissal be affirmed on appeal:

> Within ten (10) days of the expiration of any time period during which such judgment of dismissal may be appealed or, if any appeal from such judgment is taken, upon approval of such judgment by the court of last resort (or the highest court to which any such appeal is taken), an amount equal to fifty percent of the Settlement Fund (or the portion thereof attributable to PCX) less the costs of providing notice to the Class and Administrative Costs . . . shall be returned to PCX.  Should the Court's judgment of dismissal be finally reversed upon appeal, and be no longer subject to any further appeal, then Counsel for the Plaintiffs may . . . at once continue to disburse the remaining Settlement Fund as if such judgment of dismissal were never entered.

(Id.)

PCX made one payment of $1 million pursuant to paragraph 6.  After the Court granted the converted motions for summary judgment and the Second Circuit affirmed, Plaintiffs returned $482,309 to PCX.  Plaintiffs contend that paragraph 16 requires PCX to make the three additional

payments required by paragraph 6, but reduced by 50%. PCX argues that the consideration it bargained for is now worthless and therefore its obligations to make additional payments are unenforceable. The Court agrees.

The doctrine of frustration of purpose provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981). Here, PCX's main purposes in executing the settlement agreement were to expeditiously terminate the claims against it and to avoid the risk of greater liability. After the Second Circuit affirmed this Court's summary-judgment decision, that risk was removed and a central purpose of the settlement was rendered moot. It is clear from the language of the agreement that both parties assumed that this Court would only dismiss the claims, if at all, _after_ it had granted preliminary approval to the PCX Settlement.

The only consequence in the agreement of an order of dismissal is that "[c]ounsel for Plaintiffs shall immediately cease all disbursements of the Settlement Fund other than those necessary to pay for the continuing administration of such Fund" (PCX Settlement ¶ 16), suggesting that distributions would have already begun. No distribution of the Settlement Fund could have occurred until after the Court finally approved the settlement because class-action settlements require court approval to take effect. Fed. R. Civ. P. 23(e). The assumption was that PCX would have paid into the Settlement Fund the entire amount due, and Plaintiffs' counsel would begin distributing the Fund to class members, before the Court dismissed the case against the nonsettling defendants. Thus, dismissal prior to preliminary approval was an event that the parties assumed would not occur

and resulted in frustration of one principal purpose for which PCX agreed to the settlement. That event rendered PCX's remaining payment obligations unenforceable. See City of New York v. Long Island Airports Limousine Serv. Corp., 467 N.Y.S.2d 93, 94-95 (App. Div. 1983), aff'd, 466 N.E.2d 153 (N.Y. 1984).

In Long Island Airports, the Appellate Division considered the enforceability of a franchise contract between a transportation company and the City of New York that allowed the company to transport passengers to and from the City and New York airports. At the time of the contract, the City's consent to operate the transportation route was required by statute; however, the law was amended such that the City's consent was no longer necessary. See id. at 94. The franchise contract required the company to pay compensation to the City in exchange for its consent to operate the route. Id. The court held that the company's payment obligation was discharged because the purpose of the contract had been frustrated:

> The only possible reason for the franchise contract . . . was that the city's consent was required by statute before [the defendant company] was entitled to operate its omnibus route . . . . [T]he statutory changes have made the contract worthless to [the defendant] and also made performance of the contract vastly different from what could reasonably have been within the contemplation of the parties when the contract was made. Given these altered circumstances, it is clear that reasonable men would not have made the subject contract, and that the contract has been rendered worthless to [the defendant]. Therefore, the consideration supporting the contract has failed, and [the defendant's] performance thereof is excused.

Id. at 94-95 (internal citations omitted).

Similarly, the consideration that PCX would receive under the PCX Settlement has also failed. While the settlement would dispose of Plaintiffs' claims against PCX, the Second Circuit has held that those claims are meritless and the time for further appeals has long since expired. The risk of greater liability that PCX sought to avoid by settling no longer exists, and it was that risk that was

at the heart of the agreement.  Just as the main purpose of the franchise contract in <u>Long Island Airport</u> was frustrated, making the consideration in that contract legally worthless, 467 N.Y.S.2d at 94-95, the main purpose of the PCX Settlement has also been frustrated.  And, just as the parties agreed to the franchise contract based on the assumption that the City's consent was required for the operation of the defendant's business, <u>id.</u> at 94, the PCX Settlement assumed that PCX was at risk of greater liability in this suit and that the risk would only be alleviated (by court decision) <u>after</u> the settlement was made effective under Federal Rule of Civil Procedure 23.

Frustration of purpose is not applicable if the language of the contract suggests that the frustrated party's obligations will continue even in the face of an unforseen event.  Restatement (Second) of Contracts § 265.  Plaintiffs maintain that the language of the PCX Settlement makes the doctrine inapplicable because it provides that if the Court were to grant the motions to dismiss and that decision were to be affirmed on appeal, PCX would be entitled to a return of 50% of its payments.  (<u>See</u> PCX Settlement ¶ 16.)  But the language of the agreement concerns different circumstances than those that actually occurred.  The agreement only contemplates dismissal of the claims after PCX had made all of its payments and distributions had begun; it is silent on whether the payment obligations would continue despite the Court's removal of the risk of greater liability to PCX before the settlement became effective under Rule 23.  The provision for return of 50% of PCX's payments does not render the doctrine of frustration of purpose inapplicable because that language only applies if the settlement was approved before the claims were dismissed.  <u>See</u> <u>Long Island Airports Limousine Serv. Corp. v. City of New York</u>, 466 N.E.2d at 153.

When the Court of Appeals addressed the lower court's holding that the contract in <u>Long Island Airports</u> was no longer enforceable, it considered whether the language of the agreement

provided for the situation that occurred, which would make frustration of purpose inapplicable. The franchise contract stated that the defendant company was required to continue paying compensation to the City as long as it operated an omnibus transportation route, even if the franchise agreement was otherwise cancelled or terminated. See id. The City maintained that the contract required continued payments even though the term of the contract had expired because the company was still operating its transportation route. The Court of Appeals concluded that the language in the contract requiring continued payments only applied to circumstances in which the City's consent was required for the transportation company to operate its business. See id. The contract's payment provisions did not apply to the situation in which the City's consent was not legally required. The Court of Appeals therefore upheld that Appellate Division's decision freeing the company of its further payments under the contract. See id.

As the Court of Appeals' decision in Long Island Airports suggests, parties to a contract may bargain for a specific result if an uncontrollable event occurs rendering consideration to one party worthless, but that is not what occurred here. The doctrine of frustration of purpose discharges the frustrated party's obligations "unless the language or the circumstances [of the contract] indicate the contrary." Restatement (Second) of Contracts § 265. Like the franchise contract in Long Island Airports, however, the language of the PCX Settlement fails to provide a result other than discharge of payment obligations in the event that PCX's purpose in entering the settlement was frustrated. The language that Plaintiffs cite, like the language in the Long Island Airports franchise contract, does not contemplate the events that occurred. Paragraph 16 merely provides that PCX is entitled to a return of 50% of its payments if the Court were to dismiss the claims after, but not before, it had approved the PCX Settlement. That is apparent from the language that requires Plaintiffs counsel

to cease disbursements of settlement proceeds upon dismissal and that entitles PCX to a return of 50% of its payments less costs of notice to the class; no funds could be dispersed and no costs expended for notice if the Court had not yet approved the settlement.  As in <u>Long Island Airports</u>, the failure of the contractual language to provide a result here other than discharge of the payment obligations for the situation that actually occurred means that the parties did not bargain away the chance that one of their central purposes for the settlement would be frustrated and the consideration rendered worthless as a result.

The revelation that Plaintiffs' claims had no merit prior to approval of the PCX Settlement was an event that the parties assumed would not occur, and the assumption was central to the settlement.  It was also an event that substantially frustrated one of PCX's main purposes in settling—to avoid the risk of greater liability.  Because the parties did not bargain for a different result in the PCX Settlement, the doctrine of frustration of purpose discharges PCX's remaining payment obligations.  Therefore, the PCX Settlement shall be approved, but only to the extent that the settlement requires one payment of $1 million, with 50% of which to be returned to PCX minus the costs of class notice.[7]  That amount is fair and reasonable to the class because the class is not entitled to any recovery at all.

### 3. No Equitable Recoupment or Set Off is Due Under the PHLX Settlement

A clause of the PHLX Settlement, which was executed in June 2000, states:

Plaintiffs and the Class shall not enter into any settlement with any person in respect to any claims of any nature relating to the subject matter of the Class Action unless

---

[7] PCX also maintains that the $482,309 that Plaintiffs returned was insufficient because Plaintiffs miscalculated the costs of notice.  The Court defers ruling on this issue until such time as the costs of notice are incurred.

the terms of that settlement include a release of all claims of any nature which such person then has or may thereafter have against PHLX arising out of or relating to the subject matter of the Class Action.

(PHLX Settlement ¶ 28(a), Ex. B to Settlement Compendium.)  PHLX contends that Plaintiffs have breached this provision because they did not obtain releases from the defendants that are parties to the Global Settlement, and that the amount PHLX must pay into the Settlement Fund should be reduced as a matter of equitable recoupment or set off.  This argument is meritless.

"In order to assert the defense of equitable recoupment, a party must have a legally subsisting cause of action upon which it could maintain an independent claim."  Telmark, Inc. v. C&R Farms, Inc., 497 N.Y.S.2d 536, 537 (App. Div. 1985).  Only if PHLX had a cause of action for damages against Plaintiffs could it assert equitable recoupment.  Id.  PHLX has no such cause of action because, even if the failure to obtain releases was a breach of the PHLX Settlement, it is not a material breach of the agreement.  See 41-41 51st Street Realty Assocs. v. Tura Assocs., 616 N.Y.S.2d 73, 75 (App. Div. 1994) (holding no breach of contract when alleged breach was not material).  A material breach under New York law is one that goes to the root of the agreement between the parties.  Felix Frank Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997); Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004).

The root of the agreement here was that the class would release all claims against PHLX arising out of the subject matter of these actions.  These releases, on the other hand, would merely require PHLX's codefendants to give up all claims they might have against PHLX related to Plaintiffs' cause of action.  PHLX is silent on what benefit these releases might secure to it, and the Court finds it dubious that there would be any significant benefit given that Plaintiffs have no viable antitrust claim, there is no right to contribution among antitrust coconspirators, Texas Indus., Inc.

v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981), and the Global Settlement is void as to at least some and potentially all of the defendants that are parties to it. The breach of paragraph 28(a) provides no basis for avoiding PHLX's payment obligations or reducing them by way of equitable recoupment or set off.

PHLX also asserts that its agreement contains a provision substantially identical to paragraph 22 of the Global Settlement, which the Court has held rendered the Global Settlement null and void when the Court denied the original motion for preliminary approval. Because the Court also denied preliminary approval of the PHLX Settlement in April 2001, PHLX contends that paragraph 20 of its agreement makes the agreement null and void. PHLX admits that it confirmed a contrary interpretation of paragraph 20 in a letter to Plaintiffs dated April 18, 2001. Whether this letter constitutes an agreement to continue obligations under the PHLX Settlement is something that Plaintiffs and PHLX may address in supplemental briefing.[8]

### C.    Effect of the Last Atlantis Complaint

PHLX, CBOE, AMEX, and Market Maker Arbitrade Holdings, LLC (a party to the Global Settlement) ("Arbitrade") argue that Plaintiffs have breached the PHLX and Global Settlements by filing a complaint in the Northern District of Illinois against them and other defendants.[9] Specifically, these defendants contend that the Global Settlement provides for a release and covenant

---

[8] PHLX maintains that any ruling in PCX's favor should also apply to it "as a mater of fairness, equity, and legal construction." (PHLX Mem. at 7.) PHLX provides no support for this broad proposition, and the PHLX Settlement is not identical in pertinent part to the PCX Settlement. Nevertheless, PHLX may, if it so chooses, address in the supplemental briefing ordered herein the reasons why the Court's holding as to the PCX Settlement also applies to the PHLX Settlement.

[9] Some of these defendants argue that there was a breach, while others simply seek a clarification of the scope of the release before agreeing to preliminary approval.

not to sue on any claim:

> known and unknown, suspected or unsuspected, asserted or unasserted, in law or equity, that any Plaintiffs or Class members ever had, now have, or hereafter can, shall, or may have, arising out of, or having connection in any way whatsoever with, any fact, omission, cause, claim, count, matter or allegation that in whole or in part is the subject of, asserted in, or could have been asserted in, any of the complaints (including without limitation the Consolidated Complaint) filed in the above-captioned cases . . . .

(Global Settlement ¶ 25.) The PHLX Settlement contains a similar provision. (See PHLX Settlement, Ex. 1 ¶ 7) (amending ¶ 30 of PHLX Settlement).)

The defendants maintain that Plaintiffs' lead counsel has taken the position that this release is narrower than the defendants believed it to be. Counsel purportedly took this position in Last Atlantis, filed against many of the same defendants involved in these suits. The defendants argue that the release bars the claims in Last Atlantis. Furthermore, they assert that Plaintiffs have suggested the Second Circuit's decision in National Super Spuds, Inc. v. New York Mercantile Exchange, Inc., 660 F.2d 9 (2d Cir. 1981), would render the release unenforceable if it were interpreted as the defendants contend it should be.

Plaintiffs respond that the release provisions are extremely broad and bar class members from asserting any claim in any way related to the facts giving rise to these class actions. Contrary to the defendants representations, therefore, Plaintiffs do not contest the breadth of the release nor do they argue that such a broad release would be unenforceable under National Super Spuds.[10] There

---

[10] Plaintiffs submit that the release is not barred under National Super Spuds because that case dealt with a release for claims not asserted in the class action and not factually related to those claims that were asserted. See Nat'l Super Spuds, 660 F.2d at 18. The Second Circuit noted that "a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts." Id. at 18 n.7.

appears to be no dispute at all as to the scope or enforceability of the release, and therefore nothing for this Court to resolve in determining whether the settlements should be given preliminary approval. The Court cannot provide an advisory opinion as to the scope of the release. See Woodford v. Cmty. Action Agency of Greene County, Inc., 239 F.3d 517, 525 (2d Cir. 2001) ("An Article III federal court . . . has no jurisdiction to render advisory opinions.").

CBOE also argues that the Global Settlement should not be preliminarily approved because Plaintiffs' lead counsel has breached the agreement by representing the plaintiffs in the Last Atlantis case. Plaintiffs respond that the plaintiffs in Last Atlantis are not members of the class because they did not purchase or sell the relevant options during the relevant time period. Whether Plaintiffs are correct or not, the Last Atlantis plaintiffs could opt out of this settlement even if they were class members, a point that CBOE seems to concede. CBOE's argument that the value of the Global Settlement has been decreased by the conduct of Plaintiffs' counsel, and therefore should not be approved, is meritless. Even assuming that the agreement could be breached by Plaintiffs' counsel, the release could not protect CBOE against claims by nonmembers of the class and class members who opt out of the settlement. The objection on the ground that the Last Atlantis suit is a breach of the Global Settlement is rejected.[11]

### D.    Objections to the Proposed Notice, Summary Notice, and Distribution Plan

CBOE, PCX, and PHLX raise objections to provisions of the Notice, Summary Notice, and Distribution Plan. First, CBOE and PCX object to the Notice and Summary Notice provisions requiring them to post a link on their websites to a website that Plaintiffs will operate and maintain

---

[11] The Court takes no position on whether the plaintiffs' claims in Last Atlantis would be barred by the release if they do not opt out of the class.

and to post a copy of the Summary Notice. The former objection is based on clauses in the settlement agreements that limit the defendants' obligations with regard to class notice to cooperating with Plaintiffs in determining the form, content, timing, and method of notice, and to using their best efforts to minimize costs of notice. (See, e.g., Global Settlement ¶¶ 6, 16.) These defendants contend that they cannot be forced to bear the costs associated with posting and maintaining the Summary Notice and link on their websites. Again, there is no dispute to be resolved because Plaintiffs agree to reimburse the reasonable costs associated with posting the Summary Notice and links to their website that the defendants incur. Therefore, the objection to the Notice and Summary Notice provisions is denied.

Second, CBOE, PCX, and PHLX object to a provision of the Distribution Plan that provides:

If it is subsequently determined that a significant number of Class members have not submitted claims, Class Counsel may implement a Supplemental Notice Program which shall include causing Summary Notice to be published in a wider range of publications and/or disseminated through broadcast media. After such Supplemental Notice Program, excess amount remaining in the Settlement Fund, after payment of all claims, administrative expenses and any attorneys fees and costs awarded by the Court, will be distributed according to a cy pres program approved by the Court.

(Distribution Plan at 3.) CBOE, PCX, and PHLX contend that this provision is too vague to be approved and improperly limits the Court's discretion in allocating excess funds. The defendants further argue that the pro rata distribution in the plan would not leave any excess in the Settlement Fund. The Court need not address the issue of excess funds especially if the pro rata distribution plan will consume all of the funds. Therefore, the last sentence of the Supplemental Notice provision in the Distribution Plan should be stricken, and be replaced by the sentence: "If any excess amount remains in the Settlement Fund after such Supplemental Notice Program and after the payment of all claims, administrative expenses, and any attorneys fees and costs awarded by the

Court, the Court shall determine the manner in which any such excess is distributed." Finally, the Supplemental Notice provision should also be amended to state, "If it is subsequently determined by the Court following an application by Plaintiffs' Counsel that a significant number of Class members have not submitted claims . . . ." This amendment will cure the vagueness of the term "significant" by leaving that definition to the Court after providing the parties a chance to be heard on the matter.

Finally, PCX requests additional language to be added to the Proof of Claims and Release and Notice regarding the scope of the release, and PHLX requests that the Notice and Preliminary Approval Order be amended to require additional information from opting-out class members. In both cases, the language may be added if Plaintiffs so agree, but the Court sees no basis for ordering that it be added.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary approval of the settlement agreements is **DENIED IN PART and GRANTED IN PART**. The Court concludes that: (1) the Global Settlement is null and void as to the Objecting Market Makers (LETCO, Omega, Cranmer, Kalb, AGS, and Susquehanna); (2) further briefing is required on the issue of whether the other Market-Maker Defendants, CBOE, AMEX, and PHLX remain bound by the Global and PHLX Settlements; (3) the PCX Settlement is preliminarily approved but PCX is not obligated to make additional payments, and PCX's argument that it is due additional money because Plaintiffs miscalculated the costs of class notice will be addressed on a later date; (4) PHLX's claim for equitable recoupment or set off is denied; (5) the Distribution Plan shall be amended as set forth above; and (6) Plaintiffs shall return the sums paid by the Objecting Market Makers under the Global

Settlement plus interest. Plaintiffs shall serve moving papers addressing which defendants they claim remain bound under paragraph 22 of the Global Settlement or paragraph 20 of the PHLX Settlement by July 26, 2005; the defendants shall serve opposition briefs on Plaintiffs by August 9, 2005; and Plaintiffs' reply shall be due, and all of the supplemental briefs filed together with courtesy copies to the Court, by August 16, 2005.

**So Ordered:**  New York, New York
July 8, 2005

**Richard Conway Casey, U.S.D.J.**