**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| | ) |
| In Re: STOCK EXCHANGES OPTIONS TRADING | ) 99 Civ. 0962 (RCC) |
| ANTITRUST LITIGATION | ) MDL No. 1283 |
| | ) |
| | ) |
| | ) Master Docket No. M-21-79 |
| This Document Relates To: | ) (RCC) |
| | ) |
| ALL ACTIONS | ) MEMORANDUM & |
| | ) ORDER |
| | ) |

**RICHARD CONWAY CASEY, United States District Judge:**

Plaintiffs in this putative class action ("Plaintiffs") move pursuant to Fed. R. Civ. P. 23(e) for final approval of proposed settlements with the Settling Defendants[1] of this antitrust class action, as embodied in the Modified and Restated Agreement of Settlement (the "Restated Settlement Agreement") and Supplements to the Restated Settlement Agreement (the "Supplemental Agreements," and collectively with the Restated Settlement Agreement, the "Settlements" or the "Settlement Agreements"). The Settlements provide for a cash payment of $43,899,798, plus interest exceeding $3 million as of March 31, 2006 (the "Settlement Fund"). Plaintiffs' Executive

---

[1] The "Settling Defendants" are Pacific Exchange, Inc. ("PCX"), American Stock Exchange LLC ("AMEX"), Chicago Board Options Exchange ("CBOE"), Philadelphia Stock Exchange, Inc. ("PHLX"), Aribitrade Holdings, LLC, Beartooth Trading, Inc., Bear Hunter LLC, GHM, Inc., Group One Trading L.P., Hull Trading Co., LLC, Oppenheimer Noonan & Weiss LP, Refco Securities, Inc. (n/k/a Refco Securities, LLC), Spear, Leeds & Kellogg L.P. (n/k/a Goldman Sachs Execution & Clearing L.P.), Wolverine Trading, L.P., AGS Specialist Partners, Cranmer & Cranmer, Inc., Kalb Voorhis & Co., LLC, LETCO, Omega Options, LLC, and intervening third-party Susquehanna International Group, LLP.

1

Committee[2] also applies, on behalf of all Class Counsel[3] in this litigation (collectively, "Plaintiffs' Counsel"), for an award of attorneys' fees equlaing 30% of the settlement fund and the interest earned thereon, the reimbursement of expenses of $844,573.15, and an award of up to $5,000 to each of the plaintiffs who served as named class representatives.  The application is made pursuant to and in accordance with the Court's Order Preliminarily Approving the Proposed Settlements, the Notice of Proposed Settlements directed to the Class, and the terms of the Settlement Agreements.  In addition to those documents, the application is based upon the Plaintiffs' Memorandum in Support of Final Approval of the Settlements, the Affidavit of the Chairman of the Executive Committee of Plaintiffs' Counsel, the affidavits submitted by members of all of the Plaintiffs' Counsel law firms, and the other documents, pleadings, and matters of record in this case.

For the following reasons, Plaintiffs' motion for certification of a settlement class is **GRANTED**, final approval of the settlements is **GRANTED**, and Plaintiffs' Counsels' application

---

[2] The Executive Committee consists of: Glancy Binkow & Goldberg LLP ("GB&G"), Garwin Gerstein & Fisher LLP; Kohn, Swift & Graf, P.C., and Labaton Sucharow & Rudoff LLP.

[3] The remaining Class Counsel (who represent one or more Plaintiffs) include: Wechsler Harwood LLP ("WH"); Barrack, Rodos & Bacine; Berman Devalerio Pease Tabacco Burt & Pucillo; Chimicles & Tikellis LLP; Chitwood Harley Harnes LLP; Donovan Serles, LLC; Durant & Durant; Finkelstein Thompson & Loughran; Gainey & McKenna; Holzer & Holzer, LLC; Indik & McNamara, P.C.; Keating, Muething & Klekamp PLL; Lasky & Rifkind; Law Offices of Brian Barry; Law Offices of Brian M. Felgoise, P.C.; Law Offices of Charles J. Piven, P.A.; Law Offices of Curtis V. Trinko; Law Offices of James V. Bashian; Law Offices of Jeffrey S. Abraham; Law Offices of Jerald M. Stein; Law Offices of Joseph P. Garland; Law Offices of Kenneth A. Elan; Law Offices of Roy Jacobs & Associates; Lockridge Grindal Nauen P.L.L.P.; Miller Faucher & Cafferty LLP; The Miller Law Firm, PC; Motley Rice LLC; Murray, Frank & Sailer LLP; Richardson, Patrick, Westbrook & Brickman, LLC; Saveri & Saveri, Inc.; Savett Frutkin Podell & Ryan, P.C.; Schiffrin & Barroway, LLP; Schubert & Reed LLP; Stull, Stull & Brody; The Furth Firm LLP; Weiss & Lurie (formerly Weiss & Yourman); Wolf Popper LLP; Wolf, Haldenstein Adler Freeman & Herz LLP; and Zelle, Hofman, Voelbel, Mason & Gette LLP.

for attorneys' fees, expenses and an incentive award for named plaintiffs is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Beginning more than seven years ago in February 1999, twenty-one putative class actions were filed in various federal district courts and subsequently consolidated for pre-trial proceedings before the Court by the Judicial Panel for Multi-District Litigation (the "Class Action").  The Plaintiffs alleged that five exchanges, and twenty-eight of the market-makers and specialists involved in the trading of stock options on the exchanges (collectively, the "Market-Maker Defendants" and, with the exchanges, "Defendants"), violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by conspiring to restrict the listing and trading of certain stock option contracts ("Class Option Contracts") to a single Exchange.  Plaintiffs alleged that Defendants had improperly refused to list and trade each Class Option Contract on more than one Exchange at various times during the Class Period, and by so restricting competition, Defendants had increased the trading costs paid by all persons who bought or sold Class Option Contracts during the Class Period at such times when the Class Option Contracts had been traded exclusively on any Exchange.  Accordingly, Plaintiffs, on behalf of the Class, sought treble damages and injunctive relief to remedy certain alleged anti-competitive practices then existing in the market for publicly traded Class Option Contracts.

Several case management orders were entered by which the Court, <u>inter alia</u>: consolidated the actions; appointed a four-firm executive committee of Class Counsel (the "Executive Committee"), a chair of the Executive Committee, a liaison counsel for the exchanges and a liaison

counsel for the Market-Maker Defendants; required the filing of a single consolidated class action complaint (the "Complaint"); scheduled briefing of proposed motions by Defendants to dismiss the Complaint and by Plaintiffs for class certification; and provided for the commencement of both merits and class discovery.

Plaintiffs filed the Complaint on October 4, 1999 and thereafter conducted extensive discovery on their claims, including a review of many thousands of relevant documents produced by Defendants. Simultaneously, Defendants commenced class discovery and deposed the named Plaintiffs that were selected by the Executive Committee to serve as the proposed representatives of the Class.

In January 2000, Plaintiffs filed a motion for class certification pursuant to the Federal Rules of Civil Procedure Rule 23, and all of the Defendants filed motions to dismiss the Complaint pursuant to Rule 12(b)(6). Several of Defendants' motions included a request for dismissal of the Class Action on the ground that the antitrust laws were impliedly repealed, with respect to the conduct alleged, by the Securities Exchange Act of 1934 ("Exchange Act").

During the first half of 2000, while continuing to conduct discovery and briefing the pending motions for class certification and to dismiss the Complaint, certain of the parties engaged in settlement discussions. On May 4, 2000, Plaintiffs entered into separate settlement agreements with defendants PCX and PHLX requiring them to, among other things: contribute to a settlement fund established for the benefit of the Class, provide expedited discovery, and cooperate as to certain matters that would assist Class Counsel in their further prosecution of the case against the remaining defendants. Shortly thereafter, the two agreements and a joint motion for preliminary approval of the proposed settlements of the Plaintiffs' and putative Class' claims against PHLX and PCX were

filed with the Court.

Following PCX and PHLX entry into agreements in which they agreed to provide certain discovery in connection with Class Counsel's litigation efforts, settlement negotiations with all of the remaining defendants (except the New York Stock Exchange) began. Then, on July 11, 2000, while settlement negotiations were still ongoing, the Court issued an order converting the portion of the motions to dismiss the Complaint on the basis of the implied immunity defense into motions for summary judgment and allowed for additional briefing.

On September 11, 2000, the Department of Justice filed a civil antitrust action against the four Settling exchanges—defendants AMEX, CBOE, PCX and PHLX—along with a consent decree that, among other things, expressly prohibited much, if not all, of the alleged anticompetitive conduct in the trading of exchange-listed equity options that had been challenged in the Class Action, and restructured certain aspects of the options industry so as to encourage greater competition in the future. That same day, the Securities and Exchange Commission issued an order, pursuant to Section 19(h) of the Exchange Act, that required the four Settling exchanges to propose rule changes that would promote competitive conduct.[4]

On October 2, 2000, following the service of the opening papers in support of the motions for summary judgment, Plaintiffs entered into the third settlement agreement (the "Global Settlement Agreement") with defendants AMEX, CBOE and eighteen of the twenty-eight Market-Maker Defendants.

---

[4]The final judgment was entered by the United States District Court for the District of Columbia on December 6, 2000 in United States v. American Stock Exchange, LLC, et al., Civ. No. 00-CV-02174 (EGS) (D.D.C.) and is available at www.usdoj.gov/atr/cases/f201200/201201.htm. The SEC order dated September 11, 2000 is available at www.sec.gov/litigation/admin/34-43268.htm.

On November 1, 2000, the Plaintiffs moved for preliminary approval of the Global Settlement Agreement and the two prior settlement agreements with PHLX and PCX (collectively, the "Original Settlement Agreements").   All defendants involved in the Original Settlement Agreements ("the Original Settling Defendants") joined in that motion or the initial motion in June 2000.  However, by Orders dated October 3 and October 26, 2000, the Court advised the parties that a hearing on the motions for preliminary approval of the proposed Original Settlement Agreements would be scheduled after the Court had resolved the Defendants' motions for summary judgment.

On February 14, 2001, the Court granted summary judgment for Defendants and stated:

> This Court has no jurisdiction to determine whether these allegations have any substantive merit.  Because the listing and trading of options classes falls within the purview of the regulatory scheme devised by Congress to govern the securities industry, and the active exercise of that authority by the Securities and Exchange Commission ("SEC") conflicts with the operation of the antitrust laws, the Court cannot proceed to adjudicate this matter.  Accordingly, the Court hereby grants summary judgment to defendants as the antitrust laws have been repealed by implication regarding the circumstances at issue here.

In re Stock Exchanges Options Trading Antitrust Litig., 2001 U.S. Dist. LEXIS 1381, at *1-2 20001-1 Trade Cas. (CCH) ¶¶ 73, 186; Fed. Sec. L. Rep. (CCH) ¶ 91, 328.  On March 2, 2001, the Court entered a Judgment in favor of all Defendants and directed the clerk to close the case file.

On March 16, 2001, Plaintiffs filed a motion to alter or amend the Judgment pursuant to Federal Rule of Civil Procedure 59(e), moving the Court to:

> clarify whether the March Judgment was intended by the Court to be a dismissal for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h) (3), or a dismissal on the merits based upon the affirmative defense of the implied repeal doctrine pursuant to Fed. R. Civ. P. 56(b).  If it is the latter, plaintiffs respectfully request that the Court also amend the March Judgment to provide that it shall only apply to those defendants who had not entered into an agreement to

settle all claims asserted against them prior to the entry of the judgment on March 2, 2001 . . . .

By Opinion and Order dated April 24, 2001 (the "April Order"), the Court denied the motion to alter or amend the Judgment, declined to consider the proposed Original Settlement Agreements, and held that, "by entering summary judgment in favor of the defendants on the implied repeal issue, this Court divested itself of subject matter jurisdiction over plaintiffs' antitrust claims."[5]  In re Stock Exchanges Options Trading Antitrust Litig., 317 F.3d 134, 144 (2d Cir. 2003) ("Options Trading III") (citing Options Trading II, 171 F. Supp. 2d at 177).

Following Plaintiffs' appeal, both as to the granting of summary judgment and jurisdictional questions as to whether to consider the Original Settlement Agreements, on January 9, 2003, the United States Court of Appeals for the Second Circuit issued a Decision and Order by which it affirmed "the dismissal of the claims asserted in the consolidated complaint," vacated the April 2001 Order, and remanded the Class Action to the Court "for further proceedings with respect to the settlement agreements."  Following the decision by the Second Circuit, certain disputes arose between various Original Settling Defendants and Plaintiffs concerning the Original Settlement Agreements.

Original Settling Defendants filed papers in this Court in response to Plaintiffs' renewed consolidated motion for preliminary approval of the Original Settlement Agreements in which the Original Settling Defendants contended that, among other things, the Original Settlement Agreements were no longer valid; were not enforceable in whole, or in part; and/or included provisions that could be interpreted to prohibit judicial approval of the Original Settlement

---

[5]  The opinion and April Order are reported at In re Stock Exchanges Options Trading Antitrust Litig., 171 F. Supp. 2d 174 (S.D.N.Y. 2001) ("Options Trading II").

Agreements under legal standards applicable thereto under Rule 23 of the Federal Rules of Civil Procedure.   Plaintiffs filed papers in response to the issues raised by the Original Settling Defendants.

On July 8, 2005, the Court issued rulings in a Memorandum and Order (the "July 2005 Order") with respect to some, but not all, issues raised by the Original Settling Defendants. Significantly, the Court found the "Global Settlement" null and void as to "Objecting Market Makers" LETCO, Omega, Cranmer, Kalb, AGS, and Susquehanna, while it required further briefing as to whether the other Market Maker Defendants, CBOE, AMEX, and PHLX remained bound by the Global and PHLX settlement agreements.

Shortly thereafter, Plaintiffs moved (i) pursuant to Federal Rule of Civil Procedure 59(e), for reconsideration of parts of the July 2005 Order; (ii) pursuant to Rule 60(b) and (d), to stay parts of the July 2005 Order; and (iii) to enforce the Original Settlement Agreements against all but one of the Original Settling Defendants that were parties thereto.   Certain Settling Defendants moved pursuant to Rule 59(e) for reconsideration of parts of the July 2005 Order.   Plaintiffs also filed a Notice of Appeal from portions of the July 2005 Order.   Proceedings before the Court of Appeals have been stayed pending the outcome of the post-judgment motions, pursuant to Rule 4(a)(4) of the Federal Rules of Appellate Procedure.

After the Court's July 2005 Order, final agreements restating and modifying the Original Settlement Agreements were reached with all the Settling Defendants providing a cash benefit of $43,899,798, plus interest which as of March 31, 2006 exceeds $3 million to the Class.   The Court preliminarily approved the proposed Settlements and proposed notice on February 8, 2006. Pursuant to that order, Class Counsel mailed notice to potential Class members ("Notice").   The Court

subsequently held a hearing on May 22, 2006 in which Class Counsel made arguments in support of the proposed Settlement and an award of attorneys' fees.

## II.     DISCUSSION

### A.     Certification of the Settlement Class

The Settlements contemplate the certification of a settlement class including all persons who purchased equity options after December 31, 1994 on one of Settling Defendant's exchanges.  The Court finds the proposed class meets the requirements of Rule 23 and is appropriate for final certification.

First, the Class is so large that joinder of all members is impracticable.  To date, through the claims administration process, Plaintiffs have identified over 100,000 members of the Class.  Thus, the numerosity requirement is clearly satisfied.

Next the "commonality" requirement of Rule 23(a)(2) is satisfied if "all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member."  In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).  The rule does not require that every question of law or fact be common to each class member.  Playmobil, 35 F. Supp. 2d at 240.   Each member of the class alleges that Settling Defendants have engaged in an antitrust conspiracy to restrict the listing and trading of Class Option Contracts to a single exchange.  Proof of this conspiracy is common to all members of the Class. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)."  In re NASDAQ Market-Makers Antitrust Litig., 169

F.R.D. 493, 509 (S.D.N.Y. 1996).  Thus, the commonality requirement is met.

The typicality requirement is satisfied where, as here, the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, and where the claims are based on the same legal theory.  See, e.g., Playmobil, 35 F. Supp.2d at 241; In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 379 (S.D.N.Y. 1996).  The claims of the named representatives and absent Class members need not be identical.  Indus. Diamonds, 167 F.R.D. at 379.  Typicality simply requires that a class representative have an incentive to prove all the elements of the claim which an individual member of the class would prove were he or she initiating individual claims.  NASDAQ, 169 F.R.D. at 510.  In the present case, the claims of the representative Plaintiffs are nearly identical to the claims of all Class members.  The claims of each Class member arise out of the same alleged illegal combination, conspiracy or agreement.  The typicality element is therefore satisfied.

The adequacy requirement of Rule 23(a)(4) is met if it appears that (1) the named plaintiffs have interests in common with, and not antagonistic to, the interests of the Class and (2) the plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation. NASDAQ,169 F.R.D. at 512.  Here, the representative Plaintiffs' interests are well in line with the interests of the Class—they are all victims of the same alleged conspiracy.  Plaintiffs have no interests adverse or antagonistic to any other Class member. Moreover, the Plaintiffs' Executive Committee is comprised of leading class action practitioners and is made up of qualified, experienced class action law firms.

The Class also satisfies the maintainability requirement of  Rule 23(b) because common issues of law and fact relating to the conspiracy and violation of law predominate over individual

issues.  "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  <u>NASDAQ</u>, 169 F.R.D. at 517 (citing <u>Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n</u>, 68 F.R.D. 49, 52 (E.D.N.Y. 1975)); <u>see also</u> <u>Playmobil</u>, 35 F. Supp. 2d at 245.  There is no evidence that there are, or would be, individual issues of law or fact in this case. Because these factors have all been readily met, the motion to certify a settlement class is **GRANTED**.

### B.   Approval of Final Settlement

Rule 23(e) governs the settlement of class actions and requires Court approval before a settlement is consummated.  Courts may approve a settlement in a class action if there has been adequate notice of the proposed settlement and the settlement has been the subject of a fairness hearing.  Fed. R. Civ. P. 23(e)(1).   In addition, the Court must determine that the settlement is fair, reasonable, and adequate, and must do so in light of the process leading up to settlement as well as the substantive terms of the settlement.  Fed. R. Civ. P. 23(e)(1)(C); <u>D'Amato v. Deutsche Bank</u>, 236 F.3d 78, 85 (2d Cir. 2001).  Reviewing the notice afforded the Class and the procedural and substantive fairness of the settlement, the Court finds the Settlement to be fair, reasonable, and adequate.  Indeed, but for the settlement (and the Plaintiffs' reaffirmation position) there would be no recovery whatsoever for the Class because the Court has already dismissed all substantive claims in the action.

### 1.   The Form and Manner for Dissemination of Notice

While there are no rigid rules to determine the adequacy of notice in a class action the standard is generally reasonableness.  <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 113-14 (2d Cir. 2005) <u>cert. denied</u> 125 S.Ct. 2277 (2005).  Notice need not be perfect, but need only be

the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected.  Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir.1988), cert. denied, 109 S.Ct. 785 (1989).  Generally, notice is reasonable if the average class member understands the terms of the proposed settlement and the options provided to class members thereunder.  Wal-Mart Stores, Inc., 396 F.3d at 114.

The Court preliminarily approved the proposed Settlements and proposed notice on February 8, 2006.  The Notice included a description of the history of the litigation, a description of the settlements, the time and place of the settlement hearing, the Class members' rights under the settlement (including the right to opt-out), a plan of distribution, and the intention of Plaintiffs' Counsel to apply for attorneys' fees, costs, and incentive awards for named plaintiffs.  It included a 28-page list of Class Option Contracts eligible to participate in the distribution of the settlement funds.  The Notice was disseminated by first class mail to all persons identified as possible Class members from various options related databases.  In many cases, the Claims Administrator sent the Notice to various brokerage firms who then provided it with the names and addresses of Class Members to whom the Class Notice was to be mailed, an effort which increased participation in the settlement (though delaying notice to some potential claimants).

A "Summary Notice of  Proposed Settlements and Hearing Thereon" (the "Summary Notice") was published in The Wall Street Journal on March 8 and March 15, 2006, in Barron's on March 13, 2006, and in the April issue of Futures magazine, which was available for sale on March 24, 2006.  The Summary Notice informed potential Class members of the terms of the Settlements and instructed them on how to obtain a copy of the full Notice.  The substance of the Summary

12

Notice was also posted on an internet Business Wire website.

The Court finds that the Notice in this case was reasonable because it clearly apprised Class Members of their rights and options under the settlement and that, while detailed, was comprehensible to the average Class Member.  Indeed, Counsel informs the Court that many Class Members are sophisticated institutional investors who regularly traded in options contracts during the period and who would readily understand the Notice.  With respect to the deadline for submitting claims, Counsel for Plaintiffs have informed the Court that due to the nature of notice in this case, including delay resulting from the need to often first notice brokerage firms and wait for responses or other action before noticing class members directly, the deadline for claim submissions will need to be extended.  As addressed further in section E below, in light of the delayed notice to some Class Members the Court will extend the deadline to receive claims to February 28, 2006.

### 2.      Procedural and Substantive Fairness of the Settlement

The Court examines the process leading up to the settlement to ensure the settlement is a product of good faith arms-length negotiation.  See Wal-Mart Stores, Inc., 396 F.3d at 116.  At the settlement hearing on May 22, 2006, counsel for all parties agreed that a productive and fair negotiation process produced the Settlement after a long and hard fought battle by both sides.  The Court is satisfied that the Settlement is the product of arms-length negotiation and is "untainted by any specter of collusion." Cinelli v. MCS Claim Servs., Inc., 236 F.R.D. 118, 121 (E.D.N.Y. 2006).

In evaluating the substantive fairness of a settlement, a district court must consider the factors first enumerated in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the

> risks of maintaining the class action through the trial; (7) the ability
> of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; [and] (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

Wal-Mart Stores, Inc., 396 F.3d at 117.  Because of the unique posture of this seven year-old case,

it is clear that the settlement is substantively fair to the class; the case has been thoroughly litigated

and Plaintiffs' claims have been dismissed and the grounds for dismissal upheld on appeal.  Thus

all of the "risk" related factors have largely played out already in favor of Defendants.  As the Court

noted in the July 2005 Order, "[t]here is little question that the settlement agreements here are fair

and adequate to the class because they would provide what further litigation could not—any

recovery for class members."   In re Stock Exchange Options Trading Antitrust Litig., No 99 Civ.

962, 2005 WL 1635158, at *5 (S.D.N.Y. July 8, 2005).  Plaintiff's reaffirmation position—and the

related motion for reconsideration and noticed appeal—remains the only available path to recovery,

a path with significant obstacles in light of the July 2005 Order.  Inasmuch, the all-cash benefit

provided to the Class ($43,899,798, plus more than $3 million in accrued interest) is the "best

possible recovery" and as such is fair, reasonable and adequate.  The motion is **GRANTED**.


## C.      Attorneys' Fees & Expenses

The Court must next address the uncommon issue of how much attorneys' fees, if any, the

Court should award in a case where Plaintiffs' Counsel lost the substantive issue of the case, but

managed a settlement nevertheless.  If attorneys in class actions were compensated based on the

merit of the claims they advanced, Class Counsel would be awarded zero dollars for their seven

years of litigation.  The Court would find no great injustice in that outcome.

14

But, alas, the federal courts have long recognized that a lawyer whose efforts create a common fund is entitled to a reasonable attorneys' fee from the fund as a whole.  See Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 392 (1970); Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000); Spann v. AOL Time Warner, Inc., No. 02 Civ. 8238 (DLC), 2005 WL 1330937, at *7 (S.D.N.Y. Jun. 7, 2005).  The standard is not dependent on the legal merits of the claim but derives from the equitable fund doctrine, which mandates that counsel who have performed services beneficial to a class of litigants receive compensation for their efforts.  See In re Agent Orange Prod. Liab. Litig., 818 F. 2d 226, 232 (2d Cir. 1987); Trustees v. Greenough, 105 U.S. (15 Otto) 527, 536 (1882).  Stated differently, the central inquiry when reviewing attorneys' fees charged to a common fund in a class action is whether the work performed resulted in a benefit to the class, In re Agent Orange , 818 F.2d at 237, not whether the claims succeeded.

### 1.    Choosing between Lodestar and the Percentage of the Fund Method

Plaintiffs' Counsel request the Court employ the percentage of the fund method and award 30% of the Settlement, approximately $14.1 million.  The Court has discretion to choose either the lodestar method or the percentage of the fund method when calculating attorneys' fees in a common fund case.  Goldberger, 209 F.3d at 50.  In so choosing, a court should consider the relative benefits of the methods available and should select the method most helpful in determining a reasonable fee in light of the circumstances of the case and class action cases generally.  See Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993).  While choosing the method is a matter of the district court's discretion, in reaching a determination of the reasonableness of the fee award a court should consider the following Goldberger factors:  (1) the time and labor expended

by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  Wal-Mart Stores, Inc., 396 F.3d at 121 (citing Goldberger, 209 F.3d at 50).

In the rare circumstance in a class action where full recovery has been precluded and the underlying cause of action dismissed, but where some recovery is still attained, a reasonable fee will compensate attorneys only for the portions of the case that led to some benefit for the class, and the lodestar method is best suited to the task because it allows the Court to easily decipher which efforts resulted in a benefit for the class and which did not.  Cf. Rawlings, 9 F.3d at 516 ("The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved.").  The percentage of the fund method is simply too blunt (and perhaps too arbitrary) an instrument for cases where the Court must excise from a requested fee those portions of the representation that yielded no benefit to the class.

2.      Calculation of the Lodestar

The lodestar method calculates attorneys' fees by multiplying hours reasonably expended against a reasonable hourly rate.  Wal-Mart Stores, Inc., 396 F.3d at 123 n.27.  The court may determine that an enhancement of the lodestar is warranted "based on factors such as the riskiness of the litigation and the quality of the attorneys."  Id.; see also Savoie v. Merchs. Bank, 166 F.3d 456, 460 (2d Cir. 1999); In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005).

A reasonable hourly rate is the rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  Farbotko v. Clinton County, 433 F.3d 204, 208 (2d Cir. 2005); cf. In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306 (3d

Cir.2005)

(noting that "[t]he billing rate should be a blended billing rate of all attorneys who worked on the matter"); In re Cabletron Sys., Inc. Sec. Litig., 2006 WL 2947566, at *6 (D.N.H. October 13, 2006) ("The lodestar method multiplies the hours reasonably spent by counsel by either a single blended hourly rate or several such representative rates for partners, associates, and paralegals, for example, to arrive at a reasonable fee.").  Courts have found that the applicant attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of the market rate.  See, e.g., Dillard v. City of Greensboro, 213 F.3d 1347, 1354-55 (11th Cir. 2000).  Where legal services are rendered over a period of several years, courts should use the current hourly rate when calculating the lodestar in order to compensate attorneys for the delay in payment.  Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998); Grant v. Martinez, 973 F.2d 96, 100 (2d Cir. 1992).  In determining a reasonable rate, the Court can rely on submissions by the parties, take judicial notice of the rates awarded in other similar cases and rely on its own familiarity with prevailing market rates.  Farbotko, 433 F.3d at 211-12.  The relevant community for calculation of the lodestar rate for attorneys is the forum district.  Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 419 F. Supp. 2d 206, 209 (N.D.N.Y. 2005).

    To determine the rate, the Court turns first to the submissions by Plaintiffs' Counsel. Plaintiffs' Counsel submit several documents and affidavits in support of their requested fee award. They submit a joint application which details the legal support for their requested fee award, an affidavit from Andrew Friedman, Chair of the Executive Committee of Plaintiffs' Counsel, which offers a factual recitation of the case within the relevant legal framework, and a compendium of Plaintiffs' affidavits which documents in forty exhibits (one for each firm involved) the time and rate

of each attorney and paralegal involved in this case and a categorical breakdown of expenses, as well as bios and descriptions of the relevant experience of the attorneys and firms. Most, if not all, of the individually submitted affidavits contain a statement that the hourly rate provided is the rate currently charged for non-contingent clients. Plaintiffs' Counsel also submits the declaration of Arlin M. Adams, a practicing attorney and former judge on the Third Circuit Court of Appeals, who offers his opinion that the requested fee is reasonable, in light of his interpretation of the laws and facts of the case and based on his substantial experience as a practitioner, judge, and special master for class actions. Finally, pursuant to the Court's May 22, 2006 Order, Plaintiffs' Counsel submitted a compendium of lodestar and expenses broken down by phase of litigation (i.e., prefiling matters, consolidation and certification, discovery matter, motions, appeal (implied repeal doctrine), appeal (jurisdiction over settlement), and settlement efforts).

Here, the average hourly rate overall is $424. See e.g., In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 410 (D.N.J. 2006) (calculating average hourly rate ($339), including lawyers and paralegals, when calculating lodestar cross-check). The Court's audit of the fee applications found that the top partners at the lead firms in this case tended to charge an hourly rate of between $500 and $675, while hourly rates of junior partners and partners for firms outside of New York tended to be in the range of $300 to $475. Associate rates ranged from $100 to $300 within and among firms. Paralegal rates ranged from $95 to $210, mostly varying by location.

Having fully reviewed the parties submissions, particularly the individual affidavits and descriptions of each attorney's experience, as well as Mr. Adams' expert opinion, the Court is satisfied that the rates enumerated in the affidavits are reasonable. The affidavits reflect that the fees applied for are the fees received for bill-paying clients (evidencing market rate), and the rates,

individually and the range, are reasonable based on the Court's own knowledge of the prevailing rate in this area for antitrust attorneys. Finally, the Court takes notice that the rates here are in the range (though slightly higher due to increase in rates over the past two years) of those found to be reasonable in In re Excess Value Ins. Coverage Litig., 2004 U.S Dist. LEXIS 24368, at *14 (S.D.N.Y. Nov. 29, 2004), an antitrust case which itself collected the reasonable rates in a number of recent cases out of the Southern District of New York.[6]

Next, the Court must calculate the reasonable number of hours expended. Wal-Mart Stores, Inc., 396 F.3d at 121. In determining the number of hours reasonably expended for purposes of

---

[6] In Excess Value, Southern District Magistrate Judge Kevin Nathaniel Fox wrote the following:

> The Court finds that, in this judicial district, reasonable hourly rates for litigation partners in comparable cases are between $ 350 and $ 595 per hour. See In re AMF Bowling Sec. Litig., 334 F. Supp. 2d at 467-468 (finding that hourly rates of $ 350 to $ 545 for partners in class action litigation were reasonable); Gucci America, Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 525 (S.D.N.Y. 2004) (finding rate of $ 425 per hour for partner in trademark litigation to be reasonable); Dula v. Amereon, Ltd., 2004 U.S. Dist. LEXIS 13231, No. 00 Civ. 8156, 2004 WL 1586410, at *4 (S.D.N.Y. July 15, 2004) (finding billing rates of $ 375 to $425 per hour for law firm's partners to be within normal rates); Bianco v. Erkins, 284 B.R. 349, 351 (S.D.N.Y. 2002) (finding, in 2002, that rates of $ 535 to $ 595 per hour for partners were reasonable). Additionally, the Court finds that reasonable fees for associate attorneys in this district are between $ 150 and $ 350 per hour. See Gucci America, Inc., 315 F. Supp. 2d at 525 (approving $ 290 per hour for an associate); Dula, 2004 U.S. Dist. LEXIS 13231, 2004 WL 1586410, at *4 (finding $ 275 per hour for an associate to be reasonable); Santa Fe Natural Tobacco Co. v. Spitzer, 2002 U.S. Dist. LEXIS 5384, Nos. 00 Civ. 7274, 00 Civ. 7750, 2002 WL 498631, at *6-9 (S.D.N.Y Mar. 29, 2002) (finding rates from $ 180 to $ 375 for associates appropriate in 2002). Finally, paralegal and law clerk time is reasonably compensated at up to $ 150 per hour. See Yurman Designs Inc. v. PAJ, Inc., 125 F. Supp. 2d 54, 55-56 (S.D.N.Y. 2000) (finding rate of $ 162.35 for paralegals reasonable for this district); Berlinsky v. Alcatel Alsthom Compagnie Generale D' Electricite, 970 F. Supp. 348, 351 (S.D.N.Y. 1997) (finding paralegal billing rate of $ 150 per hour reasonable); Santa Fe Natural Tobacco Co., 2002 U.S. Dist. LEXIS 5384, 2002 WL 498631, at *7-9 (approving hourly rates of $ 48 to $ 145 for paralegals and law clerks).

2004 U.S Dist. LEXIS 24368, at *14.

calculating the lodestar, the Court must exclude excessive or otherwise unnecessary hours as well as hours spent on unsuccessful claims.  Cf. Hensley v. Eckerhart, 461 U.S. 424, 440 (1983) (where multiple claims are brought, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved") (internal quotation marks omitted); Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).

Here, the Court finds that the hours expended on prefiling matters, consolidation and certification, and discovery efforts all yielded benefit to the class as each helped bring about the settlement the Court has herein approved.  While the amount of time spent on these aspects of the case is substantial (prefiling 2,488.23 hours; consolidation and certification 3,752.10 hours; discovery 13,010.33 hours), for a case of this magnitude and complexity, the number of hours are reasonable.  Needless to say, Class Counsels' collective efforts at settlement (6,081.61 hours) were beneficial to the class; without settlement there would have been no recovery at all.  So too Plaintiffs' Counsels' efforts on appeal to reverse the Court's determination that the Court lacked jurisdiction over the settlements (1,172.33 hours) was reasonable and beneficial to the Class. Having reviewed the time spent by each firm on these activities (and the attendant expenses), the Court finds the hours spent to be reasonable.

The Court finds, however, that the hours spent on the unsuccessful Sherman Act claims—the motion to dismiss subsequently converted into a motion for summary judgment (2570.10 hours) and the appeal taken on the implied repeal doctrine (1,261.25 hours)—yielded no ultimate benefit to the class and thus cannot be counted towards the reasonable hours billed by counsel.  The time spent and expenses incurred by each firm on these aspects of the case will not be counted in the determination of the final award.  The result here is a fitting representation of the current state of

class action law: plaintiffs' attorneys will be rewarded, not for bringing successful claims, but for bringing claims they can successfully settle.

### 3.      Application of Multipliers

Finally, the Court finds no need to apply a multiplier here.  First of all, quality of representation is presumed to be fully reflected in the initial lodestar figure.  In re Agent Orange, 818 F.2d at 234.  Indeed, the average hourly rate billed here is approximately $424 which more than adequately illustrates the caliber of Plaintiffs' Counsel, particularly considering that the figure accounts for the lower hourly rates charged for paralegal services.

Further, a court need not apply a risk multiplier where the case is high-risk principally because of its "highly questionable merit."  See In re Agent Orange Litig., 818 F.2d at 235. Multipliers are meant to compensate for risk without encouraging frivolousness.  Id. at 236 ("The problem with risk multipliers . . . is that they tend to reward counsel for bringing actions of dubious merit.").  Inasmuch, in considering whether to apply a multiplier, a court should "examine closely the nature of the action in order to determine whether, as a matter of public policy, it is the type of case worthy of judicial encouragement."  Id.  Thus, in Agent Orange, the Second Circuit upheld a district court's refusal to apply a multiplier where plaintiffs faced "factual and legal difficulties" from the outset, including an immunity—the military contractor defense—which "if not for the last-minute settlement . . . would have prevented class members from realizing any recovery at all."  Id. The Second Circuit further noted that compensation to class counsel was still equitable because each attorney had received the fair value of his services to the class under the lodestar analysis.  Id. at 237.

As in Agent Orange, an immunity existed here that shielded Defendants from liability—the

21

doctrine of implied repeal.  The major difference here is that this Court (and the Court of Appeals) ruled on the virtue of the affirmative defense before approving the final settlement; in <u>Agent Orange</u>, the court approving the final settlement needed to assume the defense would preclude liability whereas no assumption is necessary here.  While the Second Circuit found Plaintiffs' claims under the Sherman Act to be "neither frivolous nor contrived merely to create federal jurisdiction," it did find they lacked support in the law.  <u>Options Trading Antitrust III</u>, 317 F.3d at 150.  Indeed, the highly analogous case <u>Gordon v. New York Stock Exchange</u>, 422 U.S. 659 (1975), which this Court (and the Court of Appeals) relied on heavily in precluding Plaintiffs' claims, had been on the books for nearly 25 years when Plaintiffs' Counsel decided to bring this case.  In this circumstance, the Court finds it would be absolutely inappropriate to award a risk multiplier.  As a matter of public policy, a case such as this—one of highly questionable merit because of the likely success of an affirmative defense—is simply not the type of case that is worthy of judicial encouragement.  <u>See</u> <u>In re Agent Orange</u>, 818 F.2d at 235.  The lodestar alone reasonably compensates the firms in this case for the result achieved for the class.  <u>Quaratino</u>, 166 F.3d at 425  ("There is . . . a 'strong presumption' that the lodestar figure represents a reasonable fee.").

Thus, in light of the foregoing, and having considered explicitly and implicitly the time and labor expended by Plaintiffs' Counsel, the magnitude and complexities of the litigation, the attendant risk of the litigation, the quality of representation, the requested fee in relation to the settlement, and other public policy considerations, including whether and how to reward cases that have failed on their substantive claims, <u>Goldberger</u>, 209 F.3d at 50, the Court finds the following fees and expenses to be reasonable and hereby awards them to Plaintiffs' Counsel.

The total fee award is $11,090,510.88.  The total expense award is $732,538.90.  Because

the Court was only provided billing information by category of litigation on a firm-by-firm basis, the Court will enter the fee awards by firm, as follows:[7]

| Firm | Totals ($) |
|---|---|
| Garwin Gerstein & Fisher: | 1,694,915.00 |
| Expenses: | 67,803.80 |
| Wechsler Harwood: | 1,594,747.00 |
| Expenses: | 228,181.50 |
| Kohn, Swift & Graf: | 1,490,422.00 |
| Expenses: | 48,254.58 |
| Labaton Sucharow & Rudoff | 1,503,575.50 |
| Expenses: | 54,922.53 |
| Barrack, Rodos & Bacine | 220,786.25 |
| Expenses: | 17,823.48 |
| Berman, Devalerio Pease | 240,328.25 |
| Expenses: | 7,007.98 |
| Law Offices of Brian Berry | 92,211.25 |
| Expenses: | 17,723.00 |
| Law Offices of Brian Felgoise | 49,877.00 |
| Expenses: | 562.75 |
| Law Offices of Charles Piven | 42,037.00 |
| Expenses: | 757.69 |
| Law Office of Curtis Trinko | 52,089.00 |
| Expenses: | 5,285.57 |
| Law Offices of James Bashian | 219,112.50 |
| Expenses: | 8,366.94 |
| Law Offices of Jeffrey S Abraham | 180,056.25 |

---

[7] While most courts performing a percentage of the fund analysis employ a lodestar cross-check, here, having performed a lodestar analysis, the Court notes the "percentage cross-check" is approximately 23% of the fund, a decidedly reasonable amount.

| | |
|---|---|
| Expenses: | 19,138.54 |
| Law Offices of Jerald M Stein | 16,154.75 |
| Expenses: | 0 |
| Law Offices of Kenneth A Elan | 37,895.00 |
| Expenses: | 0 |
| Roy Jacobs & Assocs | 10,048.50 |
| Expenses: | 2,500.00 |
| Lockridge Grindal Nauen | 119,531.25 |
| Expenses: | 17,311.72 |
| Miller Faucher and Cafferty | 245,336.50 |
| Expenses: | 21,812.38 |
| Chimcles & Tikellis | 130,493.13 |
| Expenses: | 7,257.39 |
| Chitwood Harley Harnes | 170,371.25 |
| Expenses: | 10,671.51 |
| Donovan Searles | 43,230.00 |
| Expenses: | 328.98 |
| Durant & Durant | 36,914.00 |
| Expenses: | 5,556.00 |
| Finklestein, Thompson et al | 280,409.00 |
| Expenses: | 14,528.30 |
| Gainey & McKenna | 55,646.25 |
| Expenses: | 116.92 |
| Glancy Binkow & Goldberg | 142,845.50 |
| Expenses: | 25,171.61 |
| Holzer & Holzer | 106,332.50 |
| Expenses: | 3,296.22 |
| Keating Muething & Kleklamp | 17,569.00 |
| Expenses: | 9,678.49 |
| Lasky & Rifkind | 456,618.75 |

| | |
|---|---|
| Expenses: | 23,940.56 |
| The Miller Law Firm | 199,056.25 |
| Expenses: | 16,589.22 |
| Murray Frank & Sailer | 317,860.00 |
| Expenses: | 5,885.57 |
| Saveri & Saveri | 44,617.50 |
| Expenses: | 5,698.44 |
| Savett Frutkin Podell & Ryan | 232,127.50 |
| Expenses: | 13,823.31 |
| Schriffin & Barroway | 48,609.50 |
| Expenses: | 974.14 |
| Schubert & Reed | 85,759.00 |
| Expenses: | 5,958.93 |
| Stull, Stull & Brody | 99,925.00 |
| Expenses: | 7850.77 |
| The Furth Firm | 108,557.00 |
| Expenses: | 8761.16 |
| Weiss & Laurie | 285,231.25 |
| Expenses: | 23,545.68 |
| Wolf Haldenstein Adler et al | 185,248 |
| Expenses: | 12,842.95 |
| Wolf Popper | 187,712.50 |
| Expenses: | 16,671.37 |
| Zelle, Hofmann Boelbel et al | 46,255.00 |
| Expenses: | 1180.92 |
| **Total Hours and Lodestar** | **11,090,510.88** |
| **Total Expenses** | **732,538.90** |

**D.      Class Representatives**

Finally, the settlement agreement awards the representative plaintiffs $5,000 in recognition of their efforts on behalf of the class.  Class representatives are granted incentive awards for assisting in the litigation by, for instance, providing discovery and sitting for depositions.  See In re Worldcom, Inc. ERISA Litig., No. 02 Civ. 4816 (DLC), 2004 WL 2338151, at *10 (S.D.N.Y. Oct. 18, 2004).  The incentive award is also meant to compensate the named plaintiff for any personal risk incurred.  Dornberger v. Metro. Life Ins. Co., 203 F.R.D. 118, 124 (S.D.N.Y. 2001).  While several of the class representatives offered deposition testimony and otherwise fulfilled Plaintiffs' Counsel's various requests for information, assistance, and documentation, the Court finds the $5,000 completely unreasonable.  If these Plaintiffs provided a service at all, it certainly wasn't worth $5,000 each.  The only evidence Counsel offers in support of named Plaintiffs' incentive award—other than reference to $5000 awards in other cases—is that seven of the ten sat for depositions.  The Court will award these named plaintiffs $100 per hour they sat in deposition; those that did not even sit for deposition will receive no incentive award for the Court has no evidence they provided any service or took on any risks that deserve compensation other than lend their name to litigation.  Thus the only awards to named plaintiffs will be as follows:

| Named Plaintiff | Incentive Award ($) |
|---|---|
| Alan Haenel | 300 |
| I. Scott Edelstein | 200 |
| Richard T. DeVincent | 150 |
| Marc Seidband | 350 |
| Robert L. Dunn | 250 |
| Rachel Chuang | 200 |
| Mary Chin | 200 |
| Lonnie B. Reiver | 300 |
| Alan Nussbaum | 350 |
| Ram Yariv | 200 |
| Joseph Stefanelli | 350 |
| Richard Robinson | 300 |
| Lynne Howard-Reed | 200 |
| Kenneth Meaden | 300 |

**E.** **Correspondence and Objections**

The Court received eleven pieces of correspondence from class members relating to this action.  Two were proofs of claim erroneously sent to the Court.  Another two complained that the time it would take to compile the options trades would not be worth the recovery amount.  Another requested the Claims Administrator accept his claims in paper form (rather than electronically).  As to these complaints and requests, the Court takes no action.

One letter complained that the Notice was daunting and confusing and requested a simplified notice issue from the Court.  As the Court has already found the Notice to be reasonable and, as evidenced by the receipt of only one letter complaining of the Notice's complexity, understandable by the average Class Member, the Court need not further address this issue.

Four letters complained of the September 8, 2006 deadline for submitting proofs of claim. These Class Members each received notice of the settlement within days before or after the deadline. According to a November 27, 2006 letter from Class Counsel, these few letters represent many more Class members who received late notice, due at least in part on the fact that the Claims Administrator had to rely upon various brokerage firms to provide it with the names and addresses of Class Members to whom the Class Notice was to be mailed, and that not all of these firms diligently provided the administrator the necessary information for contacting Class Members. Plaintiffs' Counsel has indicated, and the Court finds that, based on the size of the Class and the difficulty identifying and noticing some Class Members, extension of the deadline to file claims is appropriate.   The Court thus extends the deadline to February 28, 2007, and orders that notice of the extension be posted in the same manner as the Summary Notice.

Finally, one objection (the "Objection"), submitted by Mr. James J. Hayes and titled

28

"Objection to Award of Attorney Fees," was received by the Court.  The Objection requested a

reduction in attorneys' fees based on what Mr. Hayes argued was purposeful delay on the part of

Plaintiffs' Counsel in administering the Notice; that the recovery for each claimant may provide no

net benefit to individual Class members; that the Notice provided no means by which the individual

claimant could calculate possible recovery or evaluate whether filing a claim is worth the time; and

that the Court cannot certify the case for settlement if the Court could not certify the case for trial.

To the extent Mr. Hayes complains of insufficient or delayed notice, the Court finds the Objection

creates no credible challenge to the findings and determinations already discussed in the Court's

final approval of the Notice.  Nor does the Court find any willful delay on the part of Plaintiffs'

Counsel.  As to Mr. Hayes' argument that there was no way for a given claimant to estimate his or

her recovery and that this somehow renders the Notice defective, for one, it is not evident that such

information is essential for valid notice and further the Notice did contained some metric by which

to calculate approximate recognized loss for Class Options Contracts during the Class period.

Finally, Mr. Hayes simply misstates the law when he claims that the Court cannot certify a

settlement class, but must certify a class for trial.  The very case Mr. Hayes cites for this

proposition—the Supreme Court's decision in Amchem Products v. Windsor, 521 U.S. 591

(1997)—carries nearly the exact opposite conclusion, namely that a court can consider certifying

a Class for settlement purposes (though it must still satisfy the requirements of Rule 23) even if

certain issues would make in inappropriate for trial.[8]

---

[8] The Court does not need to decide whether the Class could be certified for trial but in
any event it sees no obvious barriers to trial-certification in this case.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for certification of a settlement class is **GRANTED**, final approval of the settlements is **GRANTED**, and Plaintiffs' Counsels' application for attorneys' fees, expenses and an incentive award for named plaintiffs is **GRANTED IN PART** and **DENIED IN PART**. The Clerk of the Court is ordered to close this case. All pending motions are moot.

**So Ordered:**   New York, New York
December 4, 2006

_____

**Richard Conway Casey, U.S.D.J.**

30